**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

Civil Action No. 15-cv-01597-MSK-CBS

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**

   **Plaintiff,**

v.

**COLUMBINE HEALTH SYSTEMS, INC.; and
THE WORTHINGTON, INC., d/b/a New Mercer Commons Assisted Living Facility,**

   **Defendants.**

---

## OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND MOTIONS TO RESTRICT

---

THIS MATTER comes before the Court on cross Motions for Summary Judgment: Defendants Columbine Health Systems ("Columbine") and The Worthington, Inc. d/b/a New Mercer Commons Assisted Living Facility's ("New Mercer," and collectively with Columbine, "Defendants") Motion for Summary Judgment on the Only Claim Involving Marlene Hoem (**#63**); and Plaintiff Equal Employment Opportunity Commission's ("EEOC") Motion for Partial Summary Judgment (**#64**). Responses (**##76, 77**) and Replies (**##82, 83**) were filed to both motions. Also before the Court are three unopposed Motions to Restrict (**##71, 81, 86**), which were filed by Defendants.

I.   **Jurisdictional Statement**

The EEOC asserts claims under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e *et seq.*). Federal question jurisdiction exists pursuant to 28 U.S.C. § 1331.

II.    **Factual Summary**

The following is a summary of the relevant facts viewed most favorably to the non-movants.  More detail will be provided as needed in the Court's analysis.

Columbine manages several senior citizen facilities, including New Mercer, an assisted living facility in Fort Collins, Colorado.  The parties dispute whether Columbine and New Mercer are part of a single integrated enterprise, which – for the reasons explained below – is not an issue that is necessary to resolve in conjunction with this motion.  However, in construing the facts most favorably to the non-movant, the Court will refer to Columbine and New Mercer collectively.

Prior to 2008, the Defendants employed four Black as Personal Care Providers ("PCPs") (the claimants) at New Mercer.  All came from Africa.  Kiros Aregahgn is from Ethiopia, and Mohamed Osman Mahgoub, Sawson Ibrahim, and Hanaa Gual are from Sudan.  Marlene Hoem, a Caucasian, was their supervisor.

In mid-2008, the Defendants hired Paula Lewis to oversee New Mercer.  Shortly after Ms. Lewis was hired, she had a conversation with Ms. Hoem about the claimants.  According to Ms. Hoem, Ms. Lewis told her that New Mercer "had to get rid of 'these people,' because they just can't speak English."  Ms. Hoem believed these comments were discriminatory and expressed her disagreement with them to Ms. Lewis.  In September 2008, Ms. Lewis suggested that Ms. Hoem demote one of the African employees, but Ms. Hoem refused to do so.  Defendants terminated Ms. Hoem's employment a week later, citing her failure to comply with this directive as one – although not the only – reason for terminating her employment.

In early 2009, Defendants imposed a new requirement that PCPs complete a training course and pass a written examination (the "PCP Exam"). The training course and examination

were conducted in English. The four African claimants completed the course, but each received a score below 75 percent on the examination. As a result in May 2009, the Defendants terminated their employment.

The claimants timely filed EEOC complaints, the EEOC conducted an investigation and brought this lawsuit. Its Amended Complaint (**#18**) asserts three claims: (1) unlawful discrimination by disparate treatment based on race and/or national origin; (2) unlawful discrimination by disparate impact based on race and/or national origin; and (3) unlawful retaliation in termination of Ms. Hoem' s employment. Both parties filed motions for partial summary judgment.

### III.    **Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp*., 45 F.3d 357, 360 (10th Cir. 1995). A trial is required if there are material factual disputes to resolve, thus entry of summary judgment is authorized only "when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016).

A fact is material if, under the substantive law, it is an essential element of the claim. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine if the conflicting evidence would enable a rational trier of fact to resolve the dispute for either party. *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013).

Substantive law governs which facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" if the evidence presented in support of and in opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013); *Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c). Once the moving party has met its burden to establish a genuine dispute, the responding party must present competent and contradictory evidence as to a material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

When the moving party does not have the burden of proof on the pertinent issue, it may point to an absence of sufficient evidence to establish a claim or defense that the non-movant is obligated to prove. Once the movant has done so, the respondent must come forward with sufficient competent evidence to establish a *prima facie* claim or defense to justify a trial. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense will be dismissed as a matter of law. *See Celotex,* 477 U.S. at 322–23.

This case involves motions for summary judgment filed by both sides. Because the determination of whether there is a genuine dispute as to a material factual issue turns upon which party has the burden of proof and whether adequate evidence has been submitted to support a *prima facie* case or establish a genuine dispute as to material fact, each motion is

evaluated independently. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979); *In re Ribozyme Pharms., Inc., Sec. Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002).

## IV. EEOC's Motion for Partial Summary Judgment

The EEOC seeks summary judgment on 1) its claim for unlawful discrimination based on disparate impact; 2) on a discrete issue – whether Columbine and New Mercer are part of an "integrated enterprise" with over 500 employees; and 3) on four of Defendants' affirmative defenses. The Court addresses each in turn.

### A. Disparate Impact Claim

Title VII forbids not only intentional racial discrimination but also "practices that are fair in form, but discriminatory in operation," which is often described as "disparate impact" discrimination. *Hilti, Inc.*, 703 F.3d at 1220 (*citing Lewis v. City of Chicago*, 560 U.S. 205, 211 (2010)); *see* 42 U.S.C. § 2000e-2(k). The disparate impact theory seeks to remove employment obstacles which create "built-in headwinds and freeze out protected groups from job opportunities and advancement," unless those obstacles are required by business necessity. *Hilti*, 703 F.3d at 1220 (*citing EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 123, 1274 (11th Cir. 2000)).

To establish a *prima facie* claim for disparate impact, a plaintiff must come forward with evidence that shows that (i) an employer's employment practice (ii) disparately impacted a protected group of employees. *Hilti*, 703 F.3d at 1220. If the plaintiff makes this *prima facie* showing, the burden shifts to the defendant to demonstrate that the challenged practice is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i); *Hilti*, 703 F.3d at 1220. If such showing is made, the burden returns to the plaintiff to demonstrate that an available alternative employment practice would serve the

employer's legitimate business needs and cause a less severe disparate impact. *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009); *see* 42 U.S.C. § 2000e-2(k)(1)(A)(ii).

As to the first element, there is no dispute that Columbine and/or New Mercer first required passage of the PCP examination as a condition of employment. This undoubtedly qualifies as an employment practice. The question becomes whether there is evidence that it had a disparate impact on a protected group.

A prima *facie* showing of disparate impact is "essentially a threshold showing of a significant statistical disparity… and nothing more." *Ricci,* 557 U.S. at 587; *Carpenter v. Boeing Co.,* 456 F.3d 1183, 1196 (10th Cir. 2006). Although no specific mathematical formulation is required, statistical disparities between non-protected and protected groups must be substantial to raise an inference of causation. *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994-95 (1988). To determine whether the Plaintiffs' statistical evidence is sufficient, the Court considers three factors: (1) the size of the disparity between the pass/fail rates of different groups of test takers; (2) the statistical significance of the disparity; and (3) whether the statistical evidence isolates the challenged employment practice as the cause. *Hilti*, 703 F.3d at 1222.

The size of the disparity between (a) the employees of the protected group enjoying a job or job benefit; and (b) the total composition of the employees enjoying that job or benefit must be significant. *Carpenter,* 456 F.3d at 1193, 1202. The EEOC guidelines suggest that a disparity of 20 percent or more in selection rate will be considered evidence of adverse impact in a disparate impact claim. 29 C.F.R. § 1607.4(D). Although not controlling, this guideline often acts as a general rule of thumb. *See Hilti*, 703 F.3d at 1223; *see also Watson,* 487 U.S. at 995.

The second factor, statistical significance, measures the likelihood that the disparity between the groups is random. *Hilti*, 703 F.3d at 1223. Statistical significance is expressed in

terms of standard deviations. The Supreme Court has recognized that a disparity of more than two or three standard deviations makes it unlikely that the disparity occurred randomly. *Id.* (quoting *Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308 n.14 (1977))

The third factor is whether the statistical evidence isolates the specific employment practice as the cause of the disparity. *Watson*, 487 U.S. at 994. A plaintiff must show that the challenged practice results in the disparate impact by eliminating factors other than the challenged practice that might contribute to the disparity. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989). This becomes necessary when the employer uses the challenged practice along with subjective criteria to make the employment decision. *Hilti*, 703 F.3d at 1224.

The Defendants contend that the EEOC has not come forward with sufficient statistical evidence to show that the PCP Exam had a disparate impact on employees of a protected race (Black/African-American) or of a protected national origin (African).[1] Under the circumstances of this case, it is not necessary to distinguish between race and national origin because all four claimants are both Black and of African descent. The EEOC's statistical evidence includes test results for the four claimants and six other individuals identified as African and/or Black by Dr. Thomas Haladyna in his report. A spreadsheet shows the PCP Exam results for all African exam-takers. Four out of seven exam-takers of African origin, and four out of nine exam-takers who are Black, failed the PCP Exam. In comparison, only one of 138 exam-takers who were White, Hispanic, or belonged to other races failed the PCP Exam.

---

[1]    The Court previously rejected Defendants' argument that "African" cannot be considered a protected national origin for the reasons found in the Magistrate Judge's Recommendation (**#54**) on Defendants' Motion to Dismiss (**#20**).

Dr. Haladyna initially opined that the selection rate for African exam-takers (which he referred to as the "boundary rule") was less than four-fifths (or eighty percent) of the rate for all exam-takers. In a supplemental report he specified a pass rate of 42.8 percent for African exam-takers, 55.6 percent for Black exam-takers, 99.3 percent for White exam-takers, and 100 percent for Hispanic exam-takers. Dr. Haladyna found the disparity in results of 6.78 standard deviations between the groups to be significantly significant.

Taken as true, this evidence is sufficient to establish a *prima facie* disparity in test results for the protected groups. The Defendants contend, however, that Dr. Haladyna's conclusions are unreliable because that the statistical sample used was too small. For this proposition, they rely on the opinion of Dr. Harpe.

Dr. Harpe does not contradict Dr. Haladyna's mathematical findings. She does not contest that, in terms of the size of the disparity, the statistical data fails the four-fifths guideline nor that Dr. Haladyna's miscalculated the standard deviation. Instead, Dr. Harpe criticizes the small sample size for Black or African PCPs, as well as Dr. Haladyna's decision to include or exclude various test-takers from the analysis. For example, Dr. Harpe notes that 39 test-takers were excluded from analysis because not enough was known about their race or ethnicity; she asserts that given the small sample size of the "African" subgroup, if any of those excluded individuals did fall within that category, they could significantly affect the analysis.

Most prominently, Dr. Harpe invokes the so-called "flip-flop" rule, which is federal regulatory guidance promulgated (in part) by the EEOC that purportedly holds that in situations involving extremely small sample sizes, if a single hypothetical individual is subtracted from the group with the higher selection rate and added to the group with the lower rate, and the hypothetical recalculated standard deviation results in the reversal of an adverse impact

determination (*i.e.*, it is less than two or three standard deviation), there is a relatively high likelihood that the difference in selection rates is a random one. *See: Howe v. City of Akron*, 789 F. Supp. 2d 786, 801 (N.D. Ohio 2010); *see also Bazile v. City of Houston*, 858 F. Supp. 2d 718, 739-40 (S.D. Tex. 2012). Her analysis under this principle essentially consists of two parts.

First, Dr. Harpe opines that the scores of two of the African exam-takers, Mr. Mahgoub and Ms. Ibrahim, should be excluded. She relies on a memo drafted by Penny Rubala, Defendants' Director of Clinical Education, in which Ms. Rubala recorded that "during all three days of PCP class [including the quiz] Mohamed [Mahgoub] and Sawsan [Ibrahim] were cheating. This was demonstrated by [Ibrahim] holding her hand up by her face and then looking at her husband[']s quiz as he was completing answers and further by [Mr. Mahgoub] whispering under his breath in his native language to [Ms. Ibrahim]." Therefore, Dr. Harpe removes their scores from the data and makes calculations as to the size of the disparity and the statistical significance based on these removals from the populations in question (*i.e.*, two failures out of five African, and seven Black, PCPs). Those calculations show standard deviations between two and three for both groups – in other words, right on the borderline of statistical significance.

Then, Dr. Harpe invokes the flip-flop rule to show that if one removes a single failure and adds a single hypothetical individual to the passing category, and recalculates the standard deviations, those standard deviations drop below two for both the African and Black categories. As such, according to her opinion, the sample size is too small for Dr. Haladyna's statistical results to be statistically significant (or at least statistically useful). The EEOC does not address the flip-flop rule specifically but instead broadly contends that Dr. Haladyna's methodology is perfectly appropriate, and that courts commonly accept similarly small population sizes when undertaking the disparate impact analysis. The EEOC cites a number of cases in which a similar

statistical analysis apparently was used on a similarly small group, though it does not address the flip-flop rule or indicate whether that rule was applied in any of those cited cases.

In the absence of any specific, evidentiary objection to Dr. Harpe's methodology or results, the Court is left with conflicting expert opinions. Neither party has requested a Rule 702 determination, therefore at this juncture the Court treats the opinions as simply being in conflict. Because the conflict goes to a material factual issue, it must to be resolved by a jury. Because a trial will be required, it is not necessary to consider whether the PCP Exam is job-related, or whether a reasonable alternative existed. Summary judgment on this claim is denied.

B. **Integrated Enterprise**

The EEOC also seeks a summary determination that Columbine was the sole owner and operator of New Mercer and other facilities, and that as a result, the two entities are part of a single integrated enterprise employing over 500 employees. This determination is relevant to the amount of punitive damages that might be imposed. *See* 42 U.S.C. § 1981a(b)(3); *see also, e.g., E.E.O.C. v. Everdry Mktg. & Mgmt., Inc.*, 556 F. Supp. 2d 213, 218 (W.D.N.Y. 2008). The EEOC proffers evidence of common control and ownership, common management, centralized control of labor relations, and interrelated operations involving Defendants and various affiliated entities. Defendants do not contest the EEOC's factual assertions, but argues that those facts are insufficient to satisfy the integrated enterprise analysis.

There is no need to determine this issue at this time. Rule 56(a) provides: "A party may move for summary judgment, identifying *each claim or defense* – or the *part of each claim or defense* – on which summary judgment is sought." The Court has consistently held as have many other courts that a request for an award of punitive damages is not properly resolved on a

motion for summary judgment unless liability on a claim or defense is uncontroverted.[2]   This is because a request for punitive damages standing alone is neither a claim nor a defense.  It is, instead, a remedy which only arises once liability is determined.  The Court is disinclined to provide advisory rulings as to remedies that *might* be available to a prevailing plaintiff, when a trial will be required to determine liability in the first place.  *Laratta v. Foster*, No. 12-cv-02079-MSK-KMT, 2015 WL 1433109, at *5 (D. Colo. Mar. 25,  2015); *Sterling Constr. Mgmt., LLC v. Steadfast Ins. Co.*, No. 09-cv-0224-MSK-MJW, 2011 WL 3903074, at *12 (D. Colo. Sept. 6, 2011); *Medcorp, Inc. v. Pinpoint Techs., Inc.*, No. 08-cv-00867-MSK-KLM, 2009 WL 3158130, at *5 (D. Colo. Sep. 24, 2009);  *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liability Litig.*, 517 F. Supp. 2d 662, 666 (S.D.N.Y. 2007); *Felix v. CSAA Gen. Ins. Co.*, Case No. 2:15-cv-02498-APG-NJK, 2017 WL 1296183, at *2 n.20 (D. Nev. Mar. 31, 2017).  Accordingly, the EEOC's request for Summary Judgment on this issue is denied.

### C.  **Affirmative Defenses**

The EEOC also seeks summary judgment on four affirmative defenses:  (1) waiver/estoppel; (2) bona fide occupational qualification; (3) after-acquired evidence; and (4) failure of conditions precedent.  The EEOC contends that, as a matter of law, these affirmative defenses are baseless.[3]   Because the Defendants ultimately bear the burden to prove these affirmative defenses at trial, they must come forward with a prima facie showing for each, failing

---

[2]      If a jury determines liability and awards punitive damages, the parties may then address whether such damages should be capped in post-judgment proceedings.  If  the underlying facts with regard to the integrated enterprise question are uncontested , they can be stipulated to in the Final Pretrial Order.

[3]      Because Defendants' Answer (**#26**) does not specify to which claims its affirmative defenses apply, the EEOC assumes that the Defendants assert all four affirmative defenses as to all claims.  The Defendants have made no attempt to clarify which affirmative defenses apply to which claims.

which they will be dismissed.  *See, e.g., Fairfield Dev., Inc. v. J.D.I. Contractor & Supply, Inc.*, 703 F. Supp. 2d 1211, 1214-16 (D.Colo.,2010)

          1. **Waiver/Estoppel**

Defendants appear to abandon any affirmative defense of waiver; therefore, summary judgment is warranted on that defense.

The affirmative defense of estoppel is governed by Colorado law.  *See Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1062, 1067 (D. Colo. 2011); *Nicholls v. Zurich Am. Ins. Group*, 244 F.Supp.2d 1144, 1157 (D. Colo. 2003).  To prove estoppel, Defendants must show that: (i) the EEOC and/or claimants knew certain facts; (ii) Defendants were ignorant of the facts; (iii) the EEOC and/or claimants' conduct was contrary to such facts and that the EEOC and/or claimants intended that Defendants to rely upon their conduct and (iv) Defendants  relied upon the EEOC and/or claimants conduct to their detriment.  *See Sellers v. Allstate Ins. Co.*, 82 F.3d 350, 352 (10th Cir. 1996) (*citing Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984)).

Defendants argue that Ms. Aregaghn and Mr. Mahgoub led Defendants to believe they were fluent in English when they were hired, and had the Defendants known that they were not fluent in English, they would not have been hired.  As a consequence, the Defendants contend that the EEOC is now estopped from claiming that these employees were discriminated against on the basis of their limited English skills.  Defendants' proffer is based on a statement in the job applications of Ms. Aregaghn and Mr. Mahgoub that they were fluent in English, which the Defendants contend was false.  Defendants contend that both Ms. Aregaghn and Mr. Mahgoub intended that New Mercer rely on the false representation as to their language skills in hiring them.

The Defendants have failed to make a *prima facie* showing for this affirmative defense. First, they offer only argument but no evidence to support their contentions. Second, even if proven, estoppel is not an affirmative defense to a disparate impact claim. The disparate impact claim turns on the effect of the PCP Exam on groups of individuals, not particular claimants. Even if the affirmative defense was applied to the disparate impact claim, there is no factual showing Ms. Aregaghn and Mr. Mahgoub were aware that a PCP examination would be given years hence when they filled out their employment applications. *See, e.g., U.S. for Use & Benefit of Trans-Colo. Concrete, Inc. v. Midwest Constr. Co.*, 653 F. Supp. 903, 906-07 (D. Colo. 1987); *Indian Territory Op. Co. v. Bridger Petroleum Corp.*, 500 F. Supp. 449, 451 (D. Okla. 1980) (*citing Chisolm v. House*, 183 F.2d 698 (10th Cir. 1980)). Estoppel also is inapplicable to the disparate treatment claim.[4] Title VII creates a statutory right to be free of unlawful employment discrimination, including disparate treatment, which an individual's indirect conduct does not extinguish. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 54 (1974).

Accordingly, dismissal of the estoppel affirmative defense is appropriate.

### 2. **Bona Fide Occupational Qualification**

Under § 703(e)(1) of Title VII, an employer may discriminate on the basis of "religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification [BFOQ] reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e)(1); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 200

---

[4]    To prove disparate treatment, a plaintiff must show (i) an employee belongs to a protected class; (ii) the employee suffered an adverse action; and (iii) similarly situated non-minority employees were treated differently. *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1316 (10th Cir. 1992). Discriminatory motive is critical. *Watson*, 487 U.S. at 1002.

(1991).  Defendants concede that a BFOQ defense is not applicable in this matter.  Accordingly, dismissal is appropriate.

### 3.  **After-Acquired Evidence**

After-acquired evidence allows an employer, in some instances, to limit the remedies available to an unlawfully discharged employee if, through discovery, the employer learned that the employee had committed wrongdoing during his or her employment.  *Foreman v. W. Freightways, LLC*, 958 F. Supp. 2d 1270, 1283 (D. Colo. 2013); *see also McKennon v. Nashville Banner Pub. Co*., 513 U.S. 352, 352-53 (1995) (holding same in the Age Discrimination in Employment Act ("ADEA") context).  To obtain relief, an employer must demonstrate that: (i) it was unaware, prior to discharging the employee, that the employee committed misconduct; (ii) such misconduct was sufficiently severe to justify termination; and (iii) the employer would have terminated its employee had it known of the misconduct.  *Ricky v. Mapco, Inc.*, 50 F.3d 874, 876 (10th Cir.1995).  That is, the employer must establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone had the employer known of it at the time of the discharge.

The Defendants also base this affirmative defense on alleged statements on the job applications of Ms. Aregaghn and Mr. Mahgoub that they were fluent in English.  Defendants argue that had they known that this was a misrepresentation, they would have terminated those claimants' employment.  Defendants are not entirely clear on whether the termination would have been based on the claimants' lack of English proficiency or the mere fact that they (purportedly) misrepresented their English fluency on their job applications.

Conceptually, the difference in theory matters because it governs what facts are material to the defense.  If lack of English proficiency would have been the ground for firing, such

deficiency likely would have been observed in interactions with the claimants over their lengthy tenure at New Mercer, not suddenly during the course of discovery. Indeed, according to the undisputed facts, one of the claimants worked at New Mercer for nine years, and the other worked there for eighteen months. The gravamen of comments made by Ms. Lewis in 2008 was that the claimants could not speak English, but given the duration of their employment at the facility, Defendants cannot seriously contend that the discovery of any lack of fluency was only made during the course of this case.

If the grounds for firing would have been the making of a false statement in the job application process, the concept of "job application fraud" or "resume fraud" is invoked. Some courts express concern that an employer facing a wrongful discharge claim might "comb[] a discharged employee's record for evidence of any and all misrepresentations, no matter how minor or trivial, in an effort to avoid legal responsibility for an otherwise impermissible discharge"; these courts generally require that the omission or misrepresentation in the resume or job application be material and directly related to evaluating the candidate for employment. *Johnson v. Honeywell Info. Sys., Inc.*, 955 F.2d 409, 414 (6th Cir. 1992). Other courts recognize that an employer legitimately may have a "zero tolerance" policy concerning employees who lie on their job applications, but in those cases, the courts generally require the employer to show that it actually does have such a policy and that it actually enforces it in practic*e. See Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1047-48 (7th 1999). "[T]he inquiry focuses on the employer's actual employment practices, not just the standards established in its employee manuals, and reflects a recognition that employers often say they will discharge employees for certain misconduct while in practice they do not." *O'Day v. McDonnell Douglas Helicopter Corp.*, 79 F.3d 756, 759 (9th Cir. 1996). It does not appear that the Tenth Circuit has spoken on this

specific issue, at least in the Title VII context. *But see Duart v. FMC Wyo. Corp.*, 72 F.3d 117, 119 (10th Cir.1995) (suggesting that a materiality standard would be appropriate in the ADEA context).

Under either standard, an affirmative defense based on a "lie" on the application is not cognizable in this case. First, Defendants have come forward with no evidence to support that the claimants *intentionally* misrepresented a fact.

Second, Defendants have presented no evidence that the ability to speak fluent English was material to the performance of the PCP job at the time the claimants were hired nor that Defendants had standards that advised employees that they would be discharged for false statements made in employment applications. Indeed, the fact that some of the claimants worked at New Mercer for years without being terminated strongly suggests that fluency is not as material or important as Defendants now claim. Furthermore, Defendants quote from language in the job application itself which advises that any false information, misrepresentations or omissions "*may* result in the rejection of the application" – *i.e.*, that any adverse action is discretionary, not mandatory. On its face this shows that the claimants *could* have been terminated or not hired based on misrepresentations on their application, but not that they *would* have been. That is not enough to support an after-acquired evidence affirmative defense. *Sheehan*, 173 F.3d at 1048; *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252 (1989). Moreover, even if this ambiguous language was sufficient, there is no showing by the Defendants that it has ever been enforced.

Because Defendants have not put forward sufficient evidence to establish a *prima facie* showing for this affirmative defense, it is dismissed.

.

### 4. **Conditions Precedent to Suit: Conciliation**

Title VII requires the EEOC to engage in a multi-step procedure prior to filing suit against an employer. *See* 42 U.S.C. § 2000e-5(b). Upon receipt of a charge of discrimination, the EEOC undertakes an investigation and if, as here, it finds probable cause, it must "endeavor to eliminate the alleged unlawful employment practice by informal means," including, as relevant here, conciliation. *Mach Mining, LLC v. EEOC.*, 135 S. Ct. 1645, 1649 (2015). Only if the EEOC cannot secure an acceptable conciliation agreement can it bring a lawsuit.

*Mach Mining* instructs that judicial review of the EEOC's conciliation efforts is limited, as Title VII affords the EEOC discretion regarding how to conduct conciliation efforts and when to end them. The Court therefore reviews conciliation only to determine: (i) whether the EEOC informed the employer about the specific allegation and its determination of "reasonable cause"; and (ii) whether the EEOC attempted to engage the employer in some form of discussion (be that written or oral), so as to give the employer an opportunity to remedy the allegedly discriminatory practice prior to litigation. Judicial review of those requirements (and nothing else) ensures that the Commission complies with the statute. *Id.* at 1656.

Here, the Defendants do not challenge whether the EEOC provided them with adequate notice of the charge, nor do they dispute that the EEOC made some conciliation efforts. Rather, Defendants appear to argue that, during the conciliation process, the Defendants "made monetary offers for the individual claimants to settle those claims," but the EEOC failed to disclose those offers to the claimants. Defendants offer no legal authority for the proposition that, during conciliation efforts, the EEOC is required to convey settlement offers to the aggrieved

employees. Instead, it is clear in *Mach Mining* that the Supreme Court is unwilling to impose any particular requirements on the EEOC as to how they choose to go about the conciliation process.

Without any evidence that the EEOC failed to meet either of the two conciliation requirements outlined in *Mach Mining*, the Court finds that summary judgment on this defense in favor of the EEOC is proper.

V. **Defendants' Motion for Summary Judgment on the Claim Involving Ms. Hoem**

Defendants move for summary judgment on the EEOC's third claim – retaliation against Ms. Hoem. Because the EEOC bears the burden of proof on this claim at trial, the EEOC must come forward with sufficient evidence to state a *prima facie* claim.

A. **Legal Standards**

Title VII prohibits an employer from retaliating against an employee because she opposed a practice made unlawful by Title VII. *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004). In the Tenth Circuit, an employee may establish Title VII retaliation in one of two ways. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011). Under the direct evidence/mixed-motives approach, an employee may directly show that retaliatory animus played a motivating part in the employment decision. Alternatively, if the employee cannot directly show that a retaliatory animus played a part in the employment decision, she may rely on the three-part *McDonnell Douglas* burden-shifting framework. *Fye v. Okla. Corp Comm'n*, 516 F.3d 1217, 1225, 1227 (10th Cir. 2008).

Under the *McDonnell Douglas* framework, an employee bears the initial burden to establish a prima facie case for retaliation. *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211-12 (10th Cir. 2008). To do so, an employee must offer evidence that: (1) she engaged in protected conduct; (2) she suffered a materially adverse action; and (3) there is a causal connection between the protected conduct and the adverse action. *Id.* at 1212. If an employee meets that

requirement, the burden shifts to the employer to offer a legitimate, non-retaliatory reason for its action. Once the employer has offered a facially neutral reason, the burden returns to the employee to show that the reason is merely a pretext for retaliation. *Id.* at 1211.

Here, the EEOC does not argue that it can point to any direct evidence of a retaliatory motive; thus, the *McDonnell Douglas* burden-shifting analysis is implicated. Defendants only challenge the first *McDonnell Douglas* factor – *i.e.*, whether Hoem engaged in protected conduct.

### B. Discussion

The EEOC offers the following evidence, which the Court views in the light most favorable to that entity. Ms. Hoem worked at New Mercer from 1994 until she was terminated in September of 2008. Though Ms. Hoem started as a PCP, she was almost immediately promoted to a staffing position, where she was responsible for interviewing, hiring, scheduling, training, supervising, and reviewing PCPs. In this role, Ms. Hoem found African PCPs to be "wonderful with residents," because "their upbringing in their countries taught them kindness, taught them to take care of the elderly."

On September 22, 2008, the newly-hired director at New Mercer, Pamela Lewis directed Ms. Hoem to ask one of the African PCPs, Ms. Ibrahim, if she would like to transfer to housekeeping. The apparent basis for this request was a desire to move Ms. Ibrahim to a position is which she would not have much (or even any) resident contact. When Ms. Hoem complied with Ms. Lewis's instruction, Ms. Ibrahim was adamant in her wish to remain a PCP. Ms. Hoem relayed this information to Ms. Lewis, and then Ms. Hoem heard nothing further about it until the following week.

On September 30, 2008, Ms. Lewis called Ms. Hoem into her office for a meeting with an HR representative, Joyce Shorthill. Ms. Hoem was terminated at that meeting. The EEOC submitted a copy of Ms. Hoem's notes from that meeting. Ms. Hoem's notes indicate that one of the reasons she was told she was being terminated was that she refused to fire Ibrahim. Her notes reflect that when Ms. Hoem learned this, she asked at the meeting, "On what grounds [would she fire Ms. Ibrahim]?" Ms. Lewis responded that "no one could understand [Ms. Ibrahim] and [Ms. Hoem] should have read between the lines."

Ms. Lewis prepared a memo, dated September 29, 2008, outlining her reasons for terminating Ms. Hoem. It reads that Ms. Lewis "spoke with [Ms. Hoem] about an occurrence involving a resident who exhibited aggression." Ms. Lewis directed Ms. Hoem to assign a PCP to exclusively cover the resident, but despite Ms. Lewis's direction, Ms. Hoem never made an assignment. The memo explains that Ms. Hoem "lacks insight into the importance of resident care and how employees can impact the quality of care… [f]or example, [Ms. Hoem] consistently assigns limited English speaking staff members to residents who have severe dementia," which "impacts the psychological status of cognitively impaired residents." Ms. Lewis wrote that she often fielded complaints from supervisors who are frustrated about the lack of discipline and poor care for residents exhibited by PCPs. Ms. Lewis attributed these problems to Ms. Hoem's "lack of leadership" and "inability to hold her employees accountable." Ms. Hoem did not see until this memo until discovery in this case, and she disputes its accuracy.

The dispositive question before the Court is whether the actions by Ms. Hoem constitute protected conduct. Protected conduct is any opposition by an employee to an employer's unlawful practices or actions. *Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.*, 595 F.3d 1126, 1132 (10th Cir. 2010). Title VII protects only discrimination-related opposition; thus, opposition

to merely "distasteful" employer practices does not suffice. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002). Protected conduct must be such that a reasonable employer would know that the employee is opposing illegal discrimination (here, discrimination based on race or national origin). *Zokari v. Gates*, 561 F.3d 1076, 1082 (10th Cir. 2009); *Petersen*, 301 F.3d at 1188-89.

Protected conduct is broadly interpreted. *See Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 277 (2009). It need not be formal; for example, an employee's informal, internal complaints to supervisors about a discriminatory practice may suffice. *Fye*, 516 F.3d at 1228; *see also Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1205 (10th Cir. 2000). Moreover, there is no requirement that the opposition specifically mention unlawful discrimination – "[m]agic words are not required, but protected opposition must at least alert an employer to the employee's reasonable belief that unlawful discrimination is at issue." *See, e.g., Brown v. United Parcel Serv., Inc.*, 406 Fed. App'x 837, 840 (5th Cir.2010); *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). That is, "[a] complaint about an employment practice constitutes protected opposition… if the individual *explicitly or implicitly* communicates a belief that the practice constitutes unlawful employment discrimination." *Murphy v. City of Aventura*, 383 Fed. App'x 915, 918 (11th Cir. 2010) (internal quotes omitted) (emphasis added); *accord Payne v. WS Services, LLC*, 216 F. Supp. 3d 1304, 1315-16 (W.D. Okla. 2016); *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)).

Courts typically hold that a wide variety of actions constitute protected conduct.[5] In this case, Defendants contend that Ms. Hoem's conduct in (i) responding to allegedly discriminatory

---

[5]     For example, an employee who responds to her employer's questions in a way that alerts the employer to the existence of sexual harassment will be sufficient. *See Crawford*, 555 U.S. at 277-78. Similarly, an employee who expressed to his supervisor that the supervisor's comments

remarks by Ms. Lewis during casual conversations; or (ii) refusing to transfer or terminating Ms. Ibrahim was not protected conduct because it was not motivated by illegal discrimination.

In this regard, the Defendants assert that the EEOC has not come forward with evidence that during Ms. Hoem's conversations with Ms. Lewis she expressed a concern about unlawful discrimination. the EEOC offers Ms. Hoem's deposition testimony, in which she testified that she specifically voiced opposition to what she viewed as national origin-based discrimination. For example, when Ms. Lewis commented on the language skills of the African PCPs and stated that New Mercer needed to "get rid of these people because they just can't speak English," Ms. Hoem opposed that view: she told Ms. Lewis that the African PCPs were "good employees, they were dependable, reliable, respectful to their coworkers and supervisors, [and] kind to the residents." During another conversation in which Ms. Lewis expressed concerns about some of the African PCPs, Ms. Hoem told her, "you don't know our employees yet," and encouraged Ms. Lewis to meet with them.

Viewed in the light most favorable to the EEOC, Ms. Hoem's verbalized disagreement with what could be interpreted as discrimination based on national origin – and especially her vocal objection to Ms. Lewis's criticisms of "these people" – is sufficient for a *prima facie* showing. Absent evidence to the contrary, a reasonable jury could find that in challenging Ms. Lewis's perceptions of the African PCPs, Ms. Hoem  was identifying  what she perceived to be unlawful discrimination. Finding a triable issue of fact, the Defendants' Motion for Summary Judgment must be denied.

---

were racist also was held to be engaging in protected conduct. *Andrews v. Fantasy House, Inc.*, 782 F. Supp. 2d 753, 758-59 (D. Minn. 2011). Opposing a refusal to hire, a termination, or a demotion of a fellow employee because of a belief that it was motivated by discrimination would also suffice. *See, e.g., EEOC v. HBE Corp.*, 135 F.3d 543, 554 (8th Cir. 1998); *Payne*, 216 F. Supp. 3d at 1316 (challenging a refusal to hire someone with a disability is protected conduct).

For purposes of trial efficiency, the Court also briefly addresses whether Ms. Hoem's purported 'refusal to fire' Ms. Ibrahim constitutes protected conduct. Refusal to fire an employee because of a reasonable belief that the firing was motivated by discrimination on the basis of race and national origin is protected conduct. According to deposition testimony of Ms. Hoem, she refused to fire Ms. Ibrahim based on her belief that to do so was unlawful discrimination, and the Defendants have not identified any reason to conclude that this belief was unreasonable.[6]

Accordingly, the Court also finds there the EEOC has produced sufficient evidence to make a *prima facie* showing that Ms. Hoem engaged in protected conduct by refusing to order an employee's discrimination-based transfer or demotion.

Defendants' Motion for Partial Summary Judgment (**#63**) is therefore **DENIED**.

VI.    **Motions to Restrict**

Defendants' three Unopposed Motions to Restrict (**##71, 81, 86**) remain.

There is a well-established common-law right of access to judicial records. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). This right is premised upon the idea that the public must retain the ability to evaluate a court's decision-making and ensure that it is promoting justice by acting as a neutral arbitrator. *See United States v. McVeigh*, 119 F.3d 806,

---

[6]    The parties argue at length over whether Ms. Lewis expressly told Ms. Hoem to terminate or demote Ms. Ibrahim and/or the other employees of African origin, or whether she merely told Ms. Hoem to transfer her to a new position. This entire issue is a red herring. Whether Ms. Lewis specifically said "you must demote or terminate these employees because they are African" is irrelevant. What is relevant is whether Ms. Hoem reasonably believed that some sort of potential adverse employment action – it does not matter whether that was a transfer or a termination – was based on discrimination against a group's race or national origin, and whether she voiced opposition to it. As noted above, Ms. Hoem's notes and deposition testimony is sufficient evidentiary support to make a *prima facie* showing for both of those protected conduct elements.

812-14 (10th Cir. 1997). A party seeking restriction must show that the public's right of access is outweighed by private interests favoring non-disclosure. *Id.* at 811.

Motions to restrict are governed by D.C.ColoLCivR 7.2. This local rule requires a moving party to: (1) identify the document for which restriction is sought; (2) explain the interest to be protected and why such interest outweighs the presumption of public access; (3) identify a clearly defined and serious injury that would result if access is not restricted; and (4) explain why no alternative to restriction will suffice. *See* D.C.Colo.LCivR 7.2. In sum, the movant must articulate a real and substantial interest that justifies depriving the public of access to documents that informed the court's decision-making process. *See Helm v. Kansas*, 656 F.3d 1277, 1292-93 (10th Cir. 2011). The fact that the parties agree to restriction or that there is a Stipulated Protective Order in place does not dictate the Court's decision or change its analysis, as the right of access belongs to the public, which is not a party to the parties' agreement or protective order. *See* D.C.Colo.LCivR 7.2(c)(2).

A. **First Motion to Restrict (#76)**.

Docket # 76 seeks Level 1 restriction for a number of exhibits to the EEOC's partial motion for summary judgment, namely Exhibits 23 through 25 (**##64-22, 64-23, and 64-24**), and Exhibit 28 (**## 64-27**, **65**).

The Court will address Exhibit 28 first. It consists of a balance sheet for Columbine. Without more, Defendants maintain that this sheet is "confidential financial information," disclosure of which could harm its business. Defendants also include a conclusory statement that "there is no practicable alternative to restriction." Defendants do not, with any specificity, explain the interest to be protected that outweighs the presumption of public access nor do they

identify a clearly defined and serious injury that would result if access is not restricted. Accordingly, Defendants fail to meet the requirements of D.C.ColoLCivR 7.2.

Exhibits 23 through 25 contain Management Agreements between Columbine and New Mercer. Defendants state only that the agreements contain "confidential, proprietary information regarding the economic relationship between the Defendants." Again, Defendants fail to explain the serious harm that could bestow them in the event of disclosure, nor why such harm outweighs the public interest. As such, Defendants also fail to meet the requirements of D.C.ColoLCivR 7.2 with respect to their request to restrict Exhibits 23 through 25 as well.

However, in resolving the motions for summary judgment, neither the question of the interrelatedness of the Defendants' businesses, nor the merits of the EEOC's integrated enterprise analysis, played any role in the Court's determination of those motions. Therefore, the public interest in those documents is minimal. The Court will grant Level 1 restriction for Exhibits 23 through 25 and Exhibit 28. The Court advises that if these documents are introduced and sought to be used at trial, they will lose their restricted status.

The First Motion to Restrict is **GRANTED**. Exhibits 23 through 25 (**##64-22, 64-23, 64-24, 64-27 and 65**) and Exhibit 8 (**##64-27, 65**) shall remain under Level 1 restriction.

B. **Second Motion to Restrict (#81).**

Docket No. 81 seeks Level 1 restriction for Exhibits 4 and 21 (**#77-4**, filed at **#78**; **#77-21**, filed at **#78-1**) to the EEOC's Response to Defendants' Motion for Summary Judgment.

Exhibit 4 is a two-page chart that lists the names and races of New Mercer's PCPs. With no detail, Defendants contend that this information is confidential because it includes "portions of personnel records" of employees, and there is no practicable alternative. Defendants again do not meet their burden to demonstrate that an interest in confidentiality that usurps the right of the

public, have not identified any harm that would result from disclosure, and have not explained why no alternative to restriction exists (for example, redacting the non-claimant employees' names and listing only their races). Because this information is relevant to disputes in this case, Defendants have not overcome the presumption of public access. However, the Court does not believe that the names of the non-claimant employees need be disclosed. Accordingly, the Court directs the EEOC to file a new version of Exhibit 4 (**#78**) that redacts the non-claimant employees' names. The EEOC shall have fourteen days to file a redacted version; if it does not do so within that time period, an unredacted version will be made public.

Exhibit 21 (**#78-1**) is Performance Improvement Plan (PIP) for a non-claimant employee. For the same reasons as those outlined above, Defendants fail to overcome the presumption of public access. This document contains information relevant to the parties' disputes. However, the particular employee's name is not material. Accordingly, the EEOC shall file a redacted version of this document that removes the non-claimant employees' names.

Defendants' Second Motion to Restrict (**#81**) is therefore **DENIED in PART** and **GRANTED in PART**. The EEOC shall re-file these exhibits without restriction and according to the Court's redaction instructions. Those redacted exhibits should be filed within fourteen days. If Defendants do not file the redacted versions of the exhibits within that time period, unredacted versions of the exhibits will be made public.

C. **Third Motion to Restrict** (**#86**)

Defendants' Third Motion to Restrict seeks Level 1 restriction for Exhibits 44 (**#83-8**, filed at **#84**) and 45 (**#83-9**, filed at **#84-1**) to the EEOC's Reply in support of its Partial Motion for Summary Judgment.

Exhibits 44 and 45 are settlement offers Defendants made to two named employees, Ms. Ibrahim and Ms. Aregahgn. Defendants offer no reasons for restriction other than a cursory statement that this information "should remain private," and thus, they have not met their burden under D.C.Colo.LCivR 7.2. Furthermore, the Court examined these documents to determine whether the EEOC met its burden to attempt conciliation as required prior to initiating litigation. As such, they are relevant to the Court's disposition of Defendants' conciliation affirmative defense and have at least some public importance.

Defendants' Motion to Restrict (**#86**) is therefore **DENIED**.

VII. **Conclusion**

The EEOC's Motion for Partial Summary Judgment (#64) is **GRANTED in PART** and **DENIED in PART**. The Motion is **denied** insofar as it requests summary judgment on the EEOC's first claim for relief, disparate impact and a finding that the Defendants are part of an integrated enterprise. The Motion is **granted** insofar as Defendants' affirmative defenses of waiver/estoppel, bona fide occupational qualification, after-acquired evidence, and conditions precedent to suit are **DISMISSED**.

Defendants' Motion for Summary Judgment on the Only Claim Involving Marlene Hoem (#63) is **DENIED**.

In the interest of clarity, the matters to be tried are:

- The EEOC's claim for disparate treatment discrimination pursuant to 42 U.S.C. § 2000e-2(a) (First Claim for Relief);

- The EEOC's claim for disparate impact discrimination pursuant to 42 U.S.C. § 2000e-2(a) (Second Claim for Relief);

- The EEOC's claim for retaliation (against Ms. Hoem) pursuant to 42 U.S.C. § 2000e-3 (Third Claim for Relief); and

- If liability is determined and if punitive damages are awarded, then whether the Defendants are an integrated enterprise.

- All affirmative defenses that have been pled but not dismissed.

The three Motions to Restrict (##71, 81 and 86) are **GRANTED, in part, and DENIED, in part.** Docket **##64-22, 64-23, 64-24, 64-27** and **65** shall remain under Level 1 restriction. The EEOC shall file **redacted** versions of Docket **##78, 78-1** under no restriction within fourteen days of the date of this order; and the Clerk shall lift the restriction on Docket **##84, 84-1** which shall be made public in unredacted form.

**Within fourteen days of this Order the parties shall 1) file a Joint Motion for a Rule 702 determination, failing which all Rule 702 objections shall be deemed waived; and 2) shall jointly contact chambers at (303) 335-2289 to set this matter for a final pretrial conference.**

Dated this 19th day of September, 2017.

BY THE COURT:

_____

Marcia S. Krieger
Chief United States District Judge